CARMEN HERNÁNDEZ TORRES, representada por su Tutor ISMAEL ZAPATER HERNÁNDEZ, demandante y recurrente, *v.* FERNANDO ZAPATER MARTÍNEZ ET AL., demandados y recurridos.

Número 11567.

*Reasignado*: 23 de septiembre de 1959. *Resuelto*: 31 de mayo de 1961.

778

*Samuel R. Quiñones,* abogado de la recurrente; *Félix Ochoteco, Jr.,* y *Antonio Zapater Cajigas,* abogados de los recurridos.

EL JUEZ ASOCIADO SEÑOR SANTANA BECERRA emitió la opinión del Tribunal.

Representada por su hijo y tutor Ismael Zapater Hernández, debidamente autorizado por la Sala de San Juan del Tribunal Superior para instituir este pleito, la demandante Carmen Hernández Torres interpuso demanda fechada 1ro. de agosto de 1950 contra Fernando Zapater Martínez, Amelia Cajigas Moreu, Antonio Zapater Cajigas, Beatriz Zapater Cajigas y su esposo Ralph O'McConnie, Amelia Zapater Cajigas y su esposo Luis Yordán y Jesús A. Bayran y su esposa Beatriz Cajigas Moreu, los demandados. En una primera causa de acción solicitó la nulidad de la sentencia dictada por la entonces Corte de Distrito de Ponce en 21 de julio de 1922 que disolvió el vínculo matrimonial entre ella y el demandado Fernando Zapater Martínez. En una segunda y

tercera causas de acción pidió la nulidad de ciertas transacciones en las que el demandado Fernando Zapater Martínez traspasó bienes que se alega pertenecían a la sociedad de gananciales constituida con la demandante; y para que se decretara la liquidación de dicha sociedad de gananciales entre ellos.

Contestada la demanda el pleito fue a juicio sin terminar de verse por renuncia del magistrado que presidía el mismo. Posteriormente falleció el demandado Fernando Zapater Martínez en 6 de noviembre de 1951. Por estipulación de las partes, el tribunal dictó orden en 7 de julio de 1953 teniendo como partes demandantes conjuntamente con Carmen Hernández a sus hijos Ismael, Fernando Manuel, Lydia Elena y Carmen María Zapater Hernández, y como demandada conjuntamente con los otros demandados, a Emma Rosa Zapater Hernández quien rehusó asociarse a los demandantes, y dispuso además que la condición de demandados de Amelia Cajigas Moreu y Antonio Zapater Cajigas lo fuera también en la capacidad de albaceas de la herencia de Fernando Zapater Martínez. Así comenzó a verse el caso nuevamente en 8 de septiembre de 1953 ante la Sala sentenciadora. Las partes estipularon (R. págs. 566–567) que se practicaría prueba y el pleito quedaría sometido únicamente en cuanto a la primera causa de acción debiendo el tribunal dictar sentencia. Los litigantes quedarían luego en libertad de solicitar juicio en cuanto a la segunda o tercera causas de acción.

Está ante nos la sentencia dictada en la primera causa de acción que declaró sin lugar la demanda. Se alegó en la misma bajo juramento que la demandante se incapacitó mentalmente en el año 1920 siendo su estado de demencia e incapacidad mental continuo, constante e incurable desde esa fecha hasta el presente; que su esposo Fernando Zapater Martínez la recluyó en el Manicomio Insular el 14 de abril de 1921 donde permaneció hasta el 29 de agosto de ese año en que él la sacó de allí, volviendo a ingresarla en septiembre

de 1925; que en julio 5 de 1922 la demandó en divorcio por trato cruel e injurias graves, constándole su condición, y que la sentencia de divorcio dictada en dicha acción es nula: (*a*) porque ella nunca fue emplazada o notificada del pleito; (*b*) el 6 de julio de 1922, fecha en que se hizo la supuesta notificación ella padecía de enajenación mental, completamente incapacitada, y no tuvo nunca conocimiento de tal acción de divorcio ni oportunidad de defenderse en la misma; (*c*) el diligenciamiento al dorso del emplazamiento es nulo no habiendo la corte adquirido jurisdicción sobre ella porque en el mismo no se hizo constar el sitio en que se emplazó; (*d*) la sentencia no le fue notificada y no tuvo noticia ni se enteró de la misma, hallándose mentalmente enajenada a la fecha en que se dice haberse notificado dicha sentencia; y (*e*) a la fecha en que se alega en la demanda que realizó los actos de trato cruel e injurias graves ella se encontraba mentalmente enajenada, siendo irresponsable de todos sus actos, si realizó algunos, que pudieran servir de base a la demanda.

Prueba documental en el récord admitida sin objeción demuestra que fechada 2 de julio de 1922 Fernando Zapater Martínez representado por el Lcdo. José Tous Soto interpuso demanda de divorcio en la entonces Corte de Distrito de Ponce contra su esposa la ahora demandante Carmen Hernández Torres, alegando haber contraído matrimonio con ella el 14 de enero de 1911; que en dicho matrimonio habían procreado como hijos suyos a Carmen María, Lydia Elena, Fernando Manuel, Ismael y Emma Rosa; que no existían bienes gananciales; y que desde hacía alrededor de dos años la esposa lo venía tratando cruelmente e injuriándole, consistiendo dichos actos en privarle del cariño y de las atenciones propias de una buena esposa y no atenderlo debidamente cuando se ha encontrado enfermo; autorizar a los hijos de ambos a realizar actos que les habían sido prohibidos por el demandante, haciendo de ese modo que los hijos no respetaran sus órdenes y perdiera él su influencia moral con ellos; tratarle de pa-

labras injuriosas, tales como "canalla", "infame" y "sinver-
güenza" públicamente y en presencia de los hijos de ambos
entre los cuales se encontraban dos que tenían ya la edad de
la razón, y de esta manera perdía la fuerza moral y el respeto
que debía merecer de sus referidos hijos; finalmente alegó
que todos esos actos habían afectado de una manera tal su
ánimo que le habían hecho enfermar y de continuar las cosas
en ese estado correría su vida inminente peligro.

En 5 de julio de 1922 se expidió el correspondiente em-
plazamiento el cual aparece diligenciado así: "Yo, José Cor-
tés González, juro solemnemente: que soy mayor de edad,
vecino de Ponce y que no tengo interés en este pleito; que el
día 6 de julio de 1922, notifiqué personalmente a la deman-
dada Doña Carmen Zapater Hernández y Torres de la
demanda, del emplazamiento y de este diligenciamiento,
haciéndole entrega de una copia fiel y exacta de cada uno de
dichos documentos. (Fdo.) José Cortés González." (Jura-
mento.) En julio 17 de 1922 Zapater solicitó por moción
al Secretario que en vista del emplazamiento diligenciado se
anotara la rebeldía de la demandada. En 18 de julio de
1922 el Secretario hizo la siguiente anotación: "Vista la
precedente moción y apareciendo del récord que el demandado*
fue debidamente emplazado de esta acción en Ponce, P. R., ([1])
el día 6 de julio de 1922 sin que haya comparecido a formular
alguna alegación contra la demanda, habiendo transcurrido
el término legal para ello, por la presente anoto la rebeldía
de dicho demandado.* Ponce P. R., Julio 18, 1922."

Tres días después, en 21 de julio de 1922, la corte dictó
opinión y sentencia haciendo constar la incomparecencia de
la allí demandada y la anotación legalmente de su rebeldía
en autos, y declaró disuelto el vínculo matrimonial entre
Fernando Zapater Martínez y Carmen Hernández Torres

---

\* Así aparece.

([1]) Del récord no aparecía que la allí demandada Carmen Hernández
hubiese sido emplazada en Ponce.

con disolución de su sociedad, ordenando que los hijos mencionados quedaran bajo la custodia y patria potestad del padre. Aparece de los autos del caso de divorcio lo que aparenta ser un escrito de notificación de sentencia fechado en 26 de julio de 1922. Dispuso la corte que no proveía respeto a bienes gananciales "porque no los hubo la indicada sociedad conyugal."(²) (R. págs. 238–245; 428).

La Sala sentenciadora concluyó, usando su propia expresión, que "[P]ara la fecha en que se radicó la demanda de divorcio, se emplazó a la aquí demandante, se anotó su rebeldía, se dictó sentencia y se notificó la misma, ésta venía padeciendo de sus facultades mentales (demencia precoz)".

Por las serias implicaciones que una conclusión de tal naturaleza tiene en la disposición de este caso, hemos estudiado detenidamente la extensa prueba en el récord sobre la condición mental de la demandante con particular atención a aquella de naturaleza pericial aportada por ambas partes, de médicos de incuestionable reputación en el campo de la

---

(²) En el récord de este caso hay prueba documental admitida sin objeción de donde surge que el 10 de junio de 1922, 25 días antes de interponerse la demanda, y por escritura núm. 152 otorgada en Ponce ante el Notario Eduardo Flores Colón, Fernando Zapater, compareciendo por sí y como apoderado de su entonces esposa Carmen Hernández Torres en virtud de poder que ésta le otorgara por escritura 119 de 16 de diciembre de 1920 ante el Notario José Tous Soto, vendió a Aurelio Maldonado una finca perteneciente a la sociedad de gananciales habida en 1915 por retroventa, sita al final de la Calle Cristina, de tres cuerdas 47 céntimos de otra, con casa, por el precio de $4,000 de los cuales el comprador retuvo $1,000 para amortizar una hipoteca sobre el inmueble y el vendedor confesó haber recibido los $3,000 restantes con anterioridad al acto. Por escritura 194 otorgada ante el mismo notario el 12 de agosto de 1922 aun no firme la sentencia, Aurelio Maldonado vendió esta finca a Fernando Zapater quien en ese acto compareció como "soltero por razón de divorcio", por igual precio y en idéntica forma de pago. Tanto la escritura 152 en que Zapater enajenó este inmueble ganancial como la 194 en que lo adquirió de nuevo como soltero fueron inscritas en el Registro en igual fecha, 18 de enero de 1923. (R. págs. 375–384; 471–476). Se alegó en la demanda y aceptaron los demandados que bajo este mismo poder de 16 de diciembre de 1920 Zapater vendió otras tres propiedades gananciales. La prueba en autos demostró, como veremos, que ya desde agosto de 1920 la aquí demandante Carmen Hernández estaba enferma mentalmente.

siquiatría, y sin dejar de darle a la prueba médica de los demandados en toda su integridad el valor que ella tiene y le corresponde en el récord, prueba ésta que lejos de crear una pugna con la prueba médica de los demandantes en general corrobora sus conclusiones, quedamos convencidos de que la anterior conclusión de la Sala sentenciadora está sostenida por una gran preponderancia de la evidencia. En sus aspectos esenciales dicha prueba se resume así:

La Dra. Pérez Marchand declaró que asistió de parto a la demandante en 1920(³) en el Hospital de Damas y pasado el alumbramiento que fue normal empezó a observar que la paciente desarrollaba y crecía en ella una apatía inmensa, condición que aumentaba a tal punto que al salir del hospital recomendó al esposo precauciones especiales porque observaba en ella condiciones mentales que no correspondían en un caso normal. Luego la visitó durante un período en su casa siguiendo la condición mental que iba en progreso y al no normalizarse se desligó del caso por entender que el mismo requería atención siquiátrica especializada que no era para su experiencia. Describió la Doctora Pérez Marchand a la demandante en este período en una condición de abandono de sí, su pensamiento moroso, distraído, en actitud apática, de una "negatividad" casi absoluta hacia todo, su cuidado personal, atención del bebé; abstracción extraordinaria progresiva, el físico decayendo, sin interés en el médico ni en la medicación la cual rechazaba; apenas hablaba, estaba totalmente anulada su personalidad en las relaciones de madre con su hijito, abandono y dejadez que tendía hacia un estado de cronicidad de demencia precoz, según luego se diagnosticó el caso. Ya en el período prenatal demostraba una condición apática morosa, lenta en el pensamiento y en el actuar que fue acreciendo y después del parto se presentó en forma negativa a todo, sin violencia y sin agresividad; una condición de ausencia de sí misma. Escuchaba pero no atendía o atendía pero no escuchaba, una actitud estática porque el dinamismo mental no aparecía. El caso era de una condición de pensamiento en blanco, una negativa absoluta, sin agresividad ni impulsividad; su cerebro una pizarra borrada.

Para esa época, la demandante vivía con el esposo, sus hijos y los padres de ella en la misma casa en la Calle Cristina.

(³) El alumbramiento ocurrió el 10 de agosto de 1920.

A recomendación de la testigo en vista del tratamiento siquiátrico que la paciente necesitaba, Zapater ingresó a su esposa en el Manicomio Insular el 14 de abril de 1921. En el certificado médico para la admisión, firmado por la Doctora Pérez Marchand, se menciona la abuela materna entre los parientes que padecían de sicosis, y a dos tías, hermanas de la madre, de demencia precoz. Algunos años después, por el 1925, la Doctora la observó en el Manicomio y dijo ser la misma paciente que había visto, los síntomas un poco acentuados y el desgaste general; y la condición apática, morosa, inconsciente. En agosto 29, 1921 a petición de Zapater la demandante fue dada de baja del Manicomio bajo un diagnóstico de melancolía aguda, haciéndose constar que se encontraba "tranquila" de su afección mental. Se advirtió que la paciente debía seguir en aislamiento.

En septiembre 29 de 1925, a petición del propio Zapater la demandante ingresó de nuevo en el Manicomio donde continuó hasta octubre de 1936. Según certificado del Dr. Santaella para el ingreso, ella padecía de enajenación mental. En el expediente se describen los síntomas de la enajenación: melancolía, exaltación, delirio de persecución, pérdida reflejo (otros que se dice no legibles), tendencia o impulso al suicidio y que podía considerarse un caso de locura peligrosa. En un memorándum al Superintendente titulado "Reunión de la Facultad en abril 22 de 1935", el Jefe de Siquiatría Clínica Dr. Luis M. Morales hizo constar que la demandante era un caso de demencia precoz con marcadas evidencias de delirio, pero no tenía inconveniente en recomendar un permiso de 15 días en su hogar bajo la custodia de su encargado. Después del ingreso de 1925 la demandante salió del Manicomio en octubre 2 de 1936 bajo una disposición de "Baja sin mejoría". Volvió a ser ingresada, a petición de una tercera persona, en 14 de noviembre del mismo año. Una nota de la Superintendente del Manicomio, Dra. Dolores M. Piñero fechada agosto 27, 1940 referente a su reingreso desde el 14

de noviembre de 1936 expone que ha estado sujeta a fases de excitación, se perfilaba por su indiferencia y aislamiento; juicio y autocrítica menoscabado. Físicamente muy depauperada. Considerando su conducta y el estado físico recomendó su salida a solicitud de su encargado, bajo diagnóstico de demencia precoz.

Según declaró el Dr. José D. Jiménez, perito médico de los demandados, él examinó a la demandante en la Clínica Juliá entre agosto 29 y octubre 10 de 1940 e hizo un diagnóstico de demencia precoz, tipo paranoide, crónico. El Dr. Ramón Fernández Marina la examinó en el año 1951 y la encontró en un estado demencial, deteriorada; un estado ya terminado del proceso demencial. Volvieron a ingresarla en el Manicomio en el 1952 y a la fecha en que se celebraba el juicio de este caso estaba allí recluida.

En lo que respecta particularmente al período comprendido entre el 29 de agosto de 1921 en que la demandante fue sacada del Manicomio y el 29 de septiembre de 1925 en que se le ingresó de nuevo, período durante el cual ocurrió el divorcio, el récord demuestra con una preponderancia de prueba,—que en muchos extremos quedó corroborada con la de los demandados, si bien en otros ésta tendió a contradecirla,—la existencia de un estado mental, actos y comportamiento de la demandante que conjuntamente con el cuadro clínico anterior y posterior llevaron al Dr. Fernández Marina a concluir que después que la doctora Pérez Marchand la envió por primera vez al Manicomio, la demandante ha estado padeciendo de un proceso sicótico, tipo "demencial", "procesual", demencia precoz. Explicó el doctor que por demencial quería decir falta de la mente, y por procesual, que es un estado que sigue un proceso de tipo deteriorante, sin brote, que es continuado, incurable, lo cual fue explicado también por el testigo médico de los demandados, Dr. Jiménez, como una manifestación de conducta anormal crónica, progresiva, agravante, en que las facultades mentales van em-

pobreciéndose y caminando hacia lo anormal; descuido, abandono, pobreza de juicio y una forma en la cual es imposible, por lo menos difícil, una recuperación. Opinó el Dr. Fernández Marina que bajo este tipo demencial, procesual, no habían momentos de lucidez o períodos de recuperación. La anterior conclusión médica específica sobre la condición esquizofrénica de la demandante desde que fue enviada primeramente al Manicomio, deteriorante y continuada sin períodos de recuperación o lucidez, no está impugnada o destruida en el récord. (⁴)

Hasta qué punto Zapater era consciente de la condición mental de su esposa, el récord habla así: Su hermana Esther Zapater declaró que después que la demandante vino del Manicomio la encontraba igual o peor. Zapater vivió en la casa algunos meses más, y se fue a vivir con la testigo y a un hotel porque, según le dijo, estaba resuelto a divorciarse "porque no podía tener su vida encadenada a una loca". Para esa época dice la testigo que veía a la demandante en condiciones desastrosas, abandonada, encerrada. Se negaba a comer y no quería juntarse con nadie. Hablaba disparates. Su hija mayor Carmen, de 12 años en ese entonces, dijo que

---

(⁴) Hay abundante prueba pormenorizada en el récord, en muchos extremos corroborada por la de los demandados según dijimos, sobre actos, la condición y el proceder de la demandante durante el período a que se refiere, y en que ocurrió el divorcio, incluyendo un suicidio frustrado, que acusan a las claras aún para el no facultativo un estado mental de locura. Estando de acuerdo con la conclusión de la Sala sentenciadora, no es preciso una exposición más íntima de tales actos y proceder de la demandante. Con relación a una pregunta sobre emplazamiento hecha por los demandados al Dr. Fernández Marina, a preguntas de los demandantes el perito declaró en cuanto al caso específico que de ser ciertos los síntomas descritos, ella estaba fuera de la realidad y no podía darse cuenta de lo que es un emplazamiento y de lo que recibió. Explicó que el concepto "tranquila" en la baja del Manicomio de 29 de agosto de 1921 quería decir que no estaba agresiva, pero no quería decir que estuviera bien. El perito médico de los demandados declaró que podía interpretarse como que había la posibilidad de que estuviera muy mejorada o recuperada, y añadió, si se conducía normalmente en el hogar (la prueba demostró que no fue así), habría la posibilidad de que hubiera recuperado, si bien opinó que de ser un caso de recuperación se debió haber puesto "recuperada" y no "tranquila". Para ellos, explicó, "tranquila" quiere decir serenidad "quiet".

al enterarse del segundo matrimonio del padre ocurrido en el 1923 habló con él y éste le dijo que se había visto obligado; que se había divorciado de su madre porque estaba loca y él no podía vivir con una loca, con una persona que no lo pudiera atender. El Lcdo. Fornaris declaró que Zapater, a quien le unía una gran amistad, se le quejaba frecuentemente después de traerla del Manicomio que su esposa estaba en un estado que no le permitía descansar y más tarde, en 1922, le manifestó que él tenía que divorciarse porque no podía seguir llevando la vida que llevaba, a lo que el testigo le hizo la reflexión de que en su concepto ella estaba enteramente incapacitada y era un paso duro, no por el paso en sí sino por la secuela que podría traerle. En ocasión del juicio Zapater le pidió que practicara la prueba en vista de que su abogado el Lcdo. José Tous Soto no llegaba, y el testigo se negó a intervenir.

Para la época del divorcio Zapater ocupaba un cargo de escribiente en el bufete del Lcdo. José Tous Soto con quien había estado trabajando durante muchos años y él era prácticamente quien dirigía el funcionamiento de la oficina. José Cortés González trabajaba allí como mensajero. Cortés falleció el 12 de diciembre de 1924. Después del divorcio la demandante fue a vivir con sus hijos en el estado mental en que se encontraba, a una casa en la Calle Condado; de ahí a otra casa en el Barrio San Antón; más tarde vivió en Corral Viejo, y en 1925 volvió al Manicomio. Zapater contrajo segundas nupcias en 31 de marzo de 1923 con Amelia Cajigas procreando tres hijos.(5)

Los demandantes-recurrentes sostienen en este recurso que la Sala sentenciadora cometió error (1) al concluir que Zapater Martínez podía iniciar y mantener una acción de

---

(5) Hay prueba documental en el récord, admitida sin objeción, acreditativa de adquisiciones, traspasos y operaciones de bienes inmuebles realizadas por Zapater después de su segundo matrimonio. En vista de que el caso se limitó a la primera causa de acción, no es necesario analizar dicha prueba.

divorcio contra su esposa loca y obtener sentencia contra ella en tal acción; (2) al no declarar que los actos alegados como causal de divorcio fueron cometidos por Carmen Hernández mientras estaba loca por lo que fue nula la sentencia dictada contra ella a base de tales actos; y al no declarar que el haber Fernando Zapater Martínez ocultado al tribunal que en el tiempo en que dichos supuestos actos ocurrieron su esposa estaba loca fue un engaño al tribunal que hace nula y sin valor la sentencia de divorcio obtenida por él contra ella; (3) al no establecer que eran nulos y sin efecto legal el emplazamiento, la sentencia y la notificación de sentencia en dicho pleito de divorcio; (4) al negarse a admitir en evidencia documentos obrantes en el expediente de Carmen Hernández en el Hospital de Siquiatría, y (5) que erró al apreciar la prueba y al dictar sentencia sobre tal errónea apreciación. El tercer error plantea una cuestión jurisdiccional y de él nos ocuparemos de inmediato.

Después de la determinación anteriormente transcrita sobre el estado mental de la demandante, la Sala sentenciadora concluyó como cuestión de hecho que al anotarse la rebeldía en la acción de divorcio no aparecía del diligenciamiento el sitio donde la demandante había sido notificada; que los esposos Zapater residían en Ponce desde una fecha anterior al 1920 y tenían allí su residencia para la fecha de la referida acción, y que la Corte de Distrito de Ponce tenía jurisdicción y competencia para entender en dicho caso. La Sala sentenciadora no hizo conclusión específica en cuanto a si la demandante fue o no efectivamente emplazada en el pleito de divorcio. Si bien se alegó en la demanda que ella nunca fue emplazada, aparte del diligenciamiento mismo no hay prueba en el récord que demuestre afirmativamente el hecho de si fue o no fue personalmente notificada. A pesar de las circunstancias que entonces concurrían en torno a la persona de la demandante, que tendían a demostrar su poca comunicabilidad, fundándonos en dicho diligenciamiento ha-

bremos de convenir que la demandante fue notificada. Cf: *Sucn. Ramírez Cherena* v. *Troche*, 39 D.P.R. 395. Freeman, *on Judgments*, págs. 2553-61.

Como cuestión de derecho concluyó la Sala que el no haberse hecho constar en el diligenciamiento del emplazamiento el sitio en que la persona ha sido emplazada, no anula el mismo ni deja por ello la corte de adquirir jurisdicción sobre la persona, invocando lo resuelto por nosotros en *Ortiz* v. *Juez Municipal, etc.*, 26 D.P.R. 302. El caso de *Ortiz*, al igual que el de *Llorens* v. *Castillo* en el cual se basó, 22 D.P.R. 670, y los de *García* v. *Brignoni*, 22 D.P.R. 356 y *García* v. *García*, 22 D.P.R. 712, envolvían una situación distinta, cual fue la omisión de hacer constar al dorso de la copia del emplazamiento entregada al demandado la fecha y el sitio de la entrega. El artículo 92 del Código de Enjuiciamiento Civil según fue enmendado en el año 1911 exigía que al servirse la copia de la citación se haría constar en ella a su dorso y por quien la hiciera, una copia literal del diligenciamiento, y fecha de éste consignado en el original. Posteriormente, en 1915 se enmendó dicho artículo para exigir solamente que se hiciera constar en la copia de la citación la fecha y sitio de su entrega y no una copia literal de todo el diligenciamiento consignado en el original. Siguiendo lo decidido en el de *Llorens*, en donde se dijo que tal omisión era una irregularidad que no viciaba de nulidad, resolvimos en *Ortiz* en parecido sentido, puntualizando el hecho que el allí demandado no alegó haber sido inducido a error en la computación del término para alegar por la omisión de consignar al dorso de la copia el sitio y fecha, o que se hubiera perjudicado de cualquier otro modo en un derecho sustancial.

La cuestión aquí envuelta es diferente: el no haberse hecho constar en el diligenciamiento mismo el sitio de la entrega, (aunque tampoco da constancia de haberse cumplido con lo dispuesto en el 2do. párrafo del artículo 92), y se regía en ese entonces por lo dispuesto también en el artículo 97 del

Código de Enjuiciamiento Civil al efecto de que la prueba de haberse hecho la citación y entrega de la demanda cuando no fuese el alguacil sería la declaración escrita y jurada de la persona que la hiciera, debiendo constar en dicha declaración escrita y jurada el tiempo y lugar en que se hizo. En el diligenciamiento en este caso no se hizo constar el lugar en que se emplazó a la demandante. En *Andino* v. *Knight*, 20 D.P.R. 198 dijimos que la diligencia de la citación debe mostrar por sí misma que se ha cumplido todo lo necesario para que pueda estimarse buena y debía aparecer en ella, entre otras cosas, el lugar en que se practicó. En ausencia de constancia en el diligenciamiento de los requisitos exigidos por los artículos 92 y 97 sostuvimos en ese caso que el Secretario no estaba facultado por la ley para anotar *válidamente* la rebeldía, ni el tribunal para adquirir jurisdicción sobre el allí demandado para juzgarlo, y anulamos la sentencia dictada en rebeldía. Se dijo también que no era suficiente que la rebeldía hubiera sido anotada, sino que el tribunal inferior debió cerciorarse de que se había anotado por el Secretario *válidamente.* (⁶)

El artículo 98 del Código de Enjuiciamiento Civil, 32 L.P.R.A., sec. 462, disponía que desde la entrega de la citación y de la copia de la demanda en un pleito civil en los casos en que se requería entregar copia de la demanda, se

---

(⁶) En 1922, cuando no existía el solo distrito judicial, la ausencia de prueba del lugar en que se emplazó afectaba sustancialmente al hecho de una anotación válida de rebeldía y el pronunciamiento de la consiguiente sentencia, ya que el término para contestar variaba de diez al de veinte días si el emplazamiento se hacía fuera del entonces distrito judicial. El récord demuestra que la rebeldía en este caso se anotó a los once días de la notificación de la demandante, y no habiéndolo sido por el alguacil de la corte no cabía presumir que se hizo dentro del distrito. Cf: *Lynch* v. *West* (W. Va.), 60 S. E. 606, donde se dijo que la presunción a favor de un *funcionario* de que ha hecho la citación dentro del distrito no favorece a una persona particular y la declaración de ésta, además de la fecha y la forma, debe exponer el lugar del emplazamiento. En *Crane* v. *Brannan* (Cal.), 3 Cal. 193, no se expresó el lugar en que se citó, pero habiéndose hecho el emplazamiento por el alguacil, se dijo que la corte debió presumir que se sirvió dentro de la jurisdicción de dicho funcionario.

consideraba que la corte había adquirido jurisdicción sobre las partes y que había quedado sometido a dicha corte todo procedimiento subsiguiente. En *Orcasitas* v. *Márquez*, 19 D.P.R. 477, expresamos, con miras a un diligenciamiento defectuoso considerado como de persona particular, que para que un demandado quede sometido a la jurisdicción de una corte es necesario que se le cite en la forma que la ley prescribe, *y, además*, que se devuelva a la corte una constancia de haberse llevado a efecto la citación, de la cual aparezca que los requisitos exigidos por el estatuto se cumplieron debidamente. Sin la constancia debida de haberse practicado la citación al anotarse la rebeldía y registrarse la sentencia los demandados no estaban aún bajo la jurisdicción de la corte. Véase *Serrano* v. *Berdiel et al*, 22 D.P.R. 445. En *Torres & Enseñat* v. *Alfaro*, 24 D.P.R. 731, añadimos que si bien era verdad que bajo el artículo 98 del Código de Enjuiciamiento Civil se consideraba que la corte había adquirido jurisdicción "desde la entrega de la citación y una copia de la demanda", para ello era necesario que hubiera ante la corte prueba auténtica y fehaciente de la citación mediante el diligenciamiento de ésta en forma legal, siendo ese el único medio que tenía la corte de saber que había adquirido jurisdicción sobre la persona del demandado. Se declaró nula en su faz la sentencia en rebeldía dictada contra el demandado por falta de jurisdicción. Y en *Delgado* v. *Registrador*, 25 D.P.R. 486, se sostuvo la nota denegatoria de inscripción de un expediente posesorio, entre otros defectos, porque el diligenciamiento no expresaba el lugar y fecha en que se hicieron las citaciones, siguiéndose la doctrina del caso de *Knight*.

En *Quintana et al.* v. *Aponte*, 26 D.P.R. 196, decidimos que actuó sin jurisdicción sobre el demandado la corte, y anulamos una sentencia en rebeldía y la subasta posterior dictada 10 años antes, cuando el diligenciamiento no expresaba que la persona que hizo la citación era mayor de 18 años. Sin embargo, este caso sugiere el principio de la prueba

*oliunde*, e hicimos constar el hecho de que al discutirse la moción sobre nulidad la parte que obtuvo la sentencia no compareció, ni alegó en torno a dicha moción que la persona que emplazó era en realidad de verdad mayor de 18 años, ni surgía tampoco que se hubiera solicitado la enmienda del diligenciamiento *nunc pro tunc*. En *Buonomo* v. *Sucn. Juncos*, 28 D.P.R. 409, se impugnó por falta de jurisdicción la validez de un título obtenido por sentencia y se alegó que el diligenciamiento no hacía constar que la persona era mayor de 18 años ni especificaba el lugar donde se practicó. Sostuvimos la nulidad de la sentencia y del título obtenido mediante ella por falta de jurisdicción sobre la persona de los demandados, siguiendo lo decidido en *Andino* v. *Knight*. No obstante, dijimos que "habiéndose suscitado esta cuestión y habiendo podido la parte demandada probar que la persona que hizo el emplazamiento tenía la edad requerida por la ley, no lo hizo".

En *López* v. *Quiñones*, 30 D.P.R. 342, confirmamos la sentencia de la corte inferior que declaró nulos el emplazamiento, la sentencia y las ventas hechas en virtud de la misma y ordenó la cancelación de las inscripciones y la restitución de los bienes, en otro de los casos en que el diligenciamiento omitió hacer constar que la persona era mayor de 18 años y no tenía interés en el asunto. Observamos igualmente que no se había presentado prueba de que la persona fuera mayor de 18 años cuando hizo la citación, por lo que había que convenir con la corte inferior en que los emplazamientos fueron nulos, la corte no adquirió jurisdicción sobre los demandados, y nulos los procedimientos posteriores. En *Rivera* v. *Rivera*, 31 D.P.R. 449, un caso de divorcio, se hizo constar en el diligenciamiento que la persona tenía 53 años de edad pero ello no aparecía en la parte en que se declaraba bajo juramento. Dijimos que la jurisdicción de la corte no surgía en propia forma de los autos y anulamos la sentencia. Expresamos ahí que la mujer no había sido emplazada cumpliéndose todas

las exigencias que requiere la ley, y que si existían ocasiones en que los tecnicismos de la ley favorecían la causa de la justicia, ésta era una de ellas. En *Banco Comercial de Puerto Rico* v. *García*, 51 D.P.R. 735, reafirmamos la doctrina de *Andino* v. *Knight* y casos que le siguieron, sosteniéndose que no había jurisdicción sobre la parte demandada al dejar de exponer el diligenciamiento el hecho de ser mayor de 18 años la persona que emplazó.

En *Ortiz* v. *San Miguel*, 34 D.P.R. 228, la doctrina de la prueba *aliunde* tomó más cuerpo. Era un pleito para reivindicar bienes adquiridos en virtud de procedimientos judiciales en que se alegó que el diligenciamiento no contenía expresión, en la parte jurada, que la persona tenía más de 18 años, no tenía interés en el pleito, y tampoco aparecía el lugar de la citación. Aceptamos que el diligenciamiento era defectuoso pero nos negamos a anular los procedimientos porque había prueba *aliunde* para demostrar que los requisitos omitidos en el diligenciamiento se habían cumplido al tiempo de hacerse las citaciones, esto es, que la persona realmente era mayor de 18 años de edad y no era parte ni tenía interés en el caso. Véanse: *Isaach* v. *Del Toro*, 33 D.P.R. 1000; *Sucn. Ramírez Cherena* v. *Troche*, supra; *Hostos* v. *Larrazábal*, 45 D.P.R. 506; *Arrarás* v. *Arzuaga*, 53 D.P.R. 713; *Rivera* v. *De Arce*, 55 D.P.R. 331; *Rodríguez et al.* v. *Cuevas Zequeira*, 25 D.P.R. 806; *Campos* v. *Central Cambalache*, 64 D.P.R. 58; *López* v. *Meléndez*, 22 D.P.R. 156. Cf: *Lawton* v. *P. R. Fruit Exchange*, 42 D.P.R. 291.

Por otra parte, hemos declarado nulos los procedimientos por carencia absoluta de jurisdicción cuando la citación en sí no se ha efectuado como manda la ley que se haga. *Gaudier* v. *Sucesión García*, 10 D.P.R. 26; *Vías* v. *Sucesión Pérez*, 15 D.P.R. 732; *Orcasitas* v. *Márquez*, supra; *Hernández* v. *Rosado et al*, 22 D.P.R. 387; *Federal Land Bank* v. *Corte*, 45 D.P.R. 117; *García León* v. *Sucn. Dávila*, 45 D.P.R. 165; *Rodríguez Soler* v. *Alonso*, 37 D.P.R. 344; o cuando el empla-

zamiento mismo es de tal manera defectuoso que aún con la citación del demandado en debida forma la corte no adquiere jurisdicción. *Andino* v. *Canales*, 26 D.P.R. 134; *Ramos* v. *Sellés, Casas y Co.*, 37 D.P.R. 604; *Martínez* v. *Figueroa*, 50 D.P.R. 951; *Vías* v. *Sucesión Pérez*, supra. Y véase: *Freiría & Co.* v. *Félix Hermanos y Cía.*, 20 D.P.R. 159.

Nuestras decisiones demuestran que no toda irregularidad en el trámite de la citación de un demandado y de la prueba de la misma produce la nulidad de raíz de la sentencia en rebeldía que por otra parte, y en ausencia de sumisión voluntaria, sería errónea o anulable. En el presente caso no surgía de los autos la autoridad en ley del Secretario para anotar válidamente la rebeldía de la aquí demandante en aquel pleito de divorcio por no haber prueba del lugar en que ella fue notificada, máxime cuando al anotarse dicha rebeldía y a la fecha en que se dictó sentencia tres días después no había vencido aún el término de veinte días que debía transcurrir si se le hubiera citado fuera del distrito judicial. Pero apareciendo que la demandante fue notificada personalmente, por una persona que juró ser mayor de edad y no tener interés en el pleito, la sentencia en rebeldía así dictada no era nula de raíz por carencia de jurisdicción sino ilegal y errónea, sujeta a ser revocada o anulada. No obstante ser anulable dicha sentencia no la habremos de anular por ese motivo ya que de la prueba practicada en este caso por una y otra parte, particularmente de aquella de la propia demandante surge, y estamos convencidos, que después que ella regresó del Manicomio en agosto 29, 1921, y hasta que quedó divorciada en julio de 1922, residió en su hogar en la Calle Cristina de Ponce sin que en momento alguno se ausentara de dicho lugar. No tenemos duda por esa prueba que la citación se hizo dentro del distrito judicial, y que al anotarse la rebeldía ya había expirado el término que tenía la demandante para comparecer. Resuelta la cuestión relativa a la nulidad de los procedimientos, pasaremos a los otros errores señalados.

 El primero imputa error a la Sala sentenciadora al concluir que Fernando Zapater podía iniciar y mantener una acción de divorcio contra su esposa loca y obtener sentencia contra ella. Concluyó la Sala sentenciadora como cuestión de derecho, apoyándose en nuestra decisión en *Subirana* v. *Cortada*, 38 D.P.R. 204, 209, que una persona loca podía ser demandada en divorcio; que era suficiente la entrega personal de copia de la demanda y del emplazamiento aun cuando la demandada estaba demente pero sin habérsele declarado judicialmente incapacitada; la falta u omisión del nombramiento de un defensor *ad litem* no anulaba el procedimiento de divorcio, y que el nombramiento de un defensor era materia procesal y no de jurisdicción, citando a *Trueba* v. *Martínez*, 33 D.P.R. 461.

Como proposición general, no ha de sostenerse que una persona loca o mentalmente incapacitada está excluida por ese hecho de la jurisdicción de los tribunales, ya sea como parte demandante o como demandada. El artículo 93, inciso (4) del Código de Enjuiciamiento Civil—32 L.P.R.A. sec. 457—disponía que si el pleito era contra una persona con residencia en la Isla que hubiere sido declarada judicialmente demente o incapacitada para atender a sus propios asuntos, y se le hubiere nombrado un tutor, la citación se haría mediante entrega de una copia de la misma a dicha persona y también a su tutor. Guardan relación los artículos 56 y 57 del propio Código—32 L.P.R.A. secs. 306, 307—. El 56 disponía que cuando un menor, demente o persona incapacitada era parte en un litigio, debería comparecer bien por medio de su tutor general, o de un defensor nombrado por la corte que entendía en el asunto, en cada caso, o por el juez de la misma. El defensor podría ser nombrado en cualquier caso cuando la corte que conocía del asunto o el juez de la misma juzgara conveniente que el menor, demente o persona incapacitada fuera representado por dicho defensor, aun cuando tuviere tutor general y hubiere comparecido por medio de

éste. El 57 disponía que al nombrarse defensor, el nombramiento debería hacerse: en el caso de una persona demente o incapacitada que fuere parte en una acción o procedimiento, a petición de un pariente o amigo de dicha persona demente o incapacitada, o de cualquiera otra de las partes en la acción o procedimiento.

En *Subirana* v. *Cortada,* supra, la esposa imputó al marido actos de trato cruel e injurias graves realizados con anterioridad a sobrevenirle la locura. Para la fecha en que se interpuso la demanda el demandado no residía en Puerto Rico, devuelta sin cumplimentar la citación se obtuvo el emplazamiento por edictos en la forma ordinaria. Anotada la rebeldía por su incomparecencia se tomaron por la corte dos deposiciones, una de la demandante y otra de su padre. En su deposición la demandante hizo constar que el esposo había enfermado en 1925 y se encontraba en un sanatorio. El padre hizo constar también que desde 1925 el demandado se había vuelto loco y se encontraba recluido desde entonces en un sanatorio en Nueva York a consecuencia de trastornos mentales. Hechas esas declaraciones, la demandante solicitó el nombramiento de un defensor para su esposo demandado, y a tal efecto presentó certificación médica de que éste se encontraba recluido en un sanatorio en Nueva York desde julio de 1925 padeciendo de enajenación mental e incapacitado. La corte de instancia proveyó a la moción ordenando el sobreseimiento y archivo de la demanda porque la citación y emplazamiento del demandado eran defectuosos, la corte no había adquirido jurisdicción sobre su persona y porque siendo el demandado un demente o presunto demente su incapacidad debió ser previamente declarada y se le debió nombrar un tutor que lo representara y no un defensor judicial. Ante esa situación dijimos, revocando a la corte inferior, que una persona loca podía ser demandada aunque la acción fuera por divorcio fundada en hechos anteriores a su locura, como resultaba ser en ese caso. Sostuvimos la procedencia de la

citación por edictos ya que el demandado no se encontraba personalmente en la Isla, y que habiendo sido así citado, la corte había adquirido jurisdicción sobre su persona, quedando entonces lo pertinente a la manera en que habría de comparecer el demandado que estaba loco. Concluimos que no era aplicable lo dispuesto en el inciso 4 del artículo 93 porque el mismo se refería a personas con residencia en la Isla que hubieren sido declaradas judicialmente dementes o incapacitadas y se les hubiere nombrado un tutor, y que dicha disposición no se aplicaba en los casos de citación por edictos, aparte de que presumía la existencia de una declaración judicial previa de la demencia o incapacidad y presumía la existencia de un tutor ya nombrado. Señalando que nuestros estatutos no decían nada con respecto a la citación de un demandado loco que estuviera fuera de Puerto Rico, seguimos la doctrina general de que la jurisdicción sobre una persona loca puede ser obtenida ordinariamente por el mismo procedimiento como si fuera cuerda, a menos que el estatuto prescriba una determinada manera de citar a un demente. Manifestamos también, que la política de la legislatura y de las cortes es dar amplia protección a los derechos e intereses de los litigantes locos, y que en ausencia de un estatuto regulando tal poder es el deber de la corte determinar el modo y manera de ejercitarlo con tal fin, teniendo autoridad con el propósito indicado para nombrar una persona que represente al loco cuando la jurisdicción para oir y resolver el asunto ha sido adquirida, ya sea residente o no, y aunque tal persona no haya sido declarada loca judicialmente ni se hubiere nombrado un tutor para ella.

Refiriéndonos a los artículos 250 al 256 del Código Civil (arts. 180 a 186 ed. 1930, 31 L.P.R.A., secs. 703 a 709) sobre la manera de declarar incapacitada a una persona por demencia o locura total, dijimos en términos generales que el estatuto no le concedía a la persona que tuviera que litigar con un loco el derecho de solicitar su declaración de incapa-

cidad y el nombramiento de un tutor, si bien en ese caso por ser la demandante esposa del demandado hubiera podido solicitarlo. Por consiguiente, los litigantes no vienen obligados a que previamente se declare incapaz a una persona con la cual han de litigar. Nos referimos entonces a lo que disponía el artículo 56 del Código de Enjuiciamiento Civil que permite a la corte o al juez nombrar un defensor al demente aun cuando el incapacitado ya tuviera un tutor, pudiendo la parte contraria en la acción solicitar tal nombramiento. Por esas razones, considerando que la corte inferior había adquirido jurisdicción sobre el demandado por su citación por edictos y que la demandante le llamó la atención sobre la locura de éste, comprobada con evidencia médica, sostuvimos que era procedente el que se hiciera el nombramiento de un defensor y revocamos la sentencia.

En *Fuentes* v. *Federal Land Bank*, 64 D.P.R. 199, se suscitó la cuestión de si el hecho de la allí deudora hallarse demente al ser requerida de pago en el procedimiento ejecutivo hipotecario, lo anulaba. Dijimos en ese entonces: "Los demandantes satisfactoriamente probaron que Carmen Fuentes se hallaba demente cuando fue requerida de pago en el procedimiento ejecutivo. Empero, ella nunca fue judicialmente declarada incapaz. Siendo ello así, la notificación del requerimiento de pago no se rige por el inciso 4 del artículo 93 del Código de Enjuiciamiento Civil, que se limita a prescribir la forma de citar a un demente que ha sido judicialmente declarado incapaz. Pero como no existe ninguna ley especial que prescriba el procedimiento para citar a un demente que no ha sido declarado incapaz, el requerimiento de pago debe hacerse siguiendo hasta donde fuere posible la forma ordinaria prescrita por el inciso 6 del mismo artículo 93, que fue la seguida en el presente caso.* El requerimiento

---

(*) El inciso 6 del artículo 93 disponía: "En los demás casos al demandado personalmente."

así hecho es válido y suficiente para conferir jurisdicción a la corte, y por consiguiente no vició de nulidad el procedimiento ejecutivo."

En *Trueba* v. *Martínez*, supra, se trataba de unos menores que se personaron en el pleito, pidieron se les hiciera partes y fueron admitidos y se les nombró un defensor *ad litem* que los representara. Posteriormente, atacando la nulidad de los procedimientos impugnaron la validez del nombramiento de defensor judicial. Sostuvimos que el nombramiento se había hecho con arreglo a los artículos 56 y 57 del Código de Enjuiciamiento Civil, y el mismo descansaba en la sana discreción de la corte, aun cuando tuviera el menor tutor general. En el curso de la argumentación expresamos que de todos modos la jurisprudencia sostenía que el nombramiento de un defensor *ad litem* era materia procesal y no de jurisdicción.

En *Díaz* v. *Quiñones,* 68 D.P.R. 249, la corte inferior anuló una subasta en un procedimiento ejecutivo porque a los efectos del requerimiento de pago no se obtuvo el nombramiento de un defensor judicial para los demandados que eran menores de edad. Revocando la sentencia, citando el caso de *Trueba,* supra, dijimos que bajo el artículo 56 el defecto de nombrar un defensor judicial en los casos en que el nombramiento proceda era una irregularidad que no afectaba la jurisdicción de la corte. Pero expresamos, no obstante, siguiendo jurisprudencia de California, que aunque el defecto no era jurisdiccional como regla general la sentencia podía ser anulada a instancias del menor hasta dentro de un tiempo razonable después que hubiera llegado a la mayoría; y que de haberse tratado de un pleito distinto al de un procedimiento ejecutivo, tendríamos que resolver que la corte inferior actuó correctamente al anular el procedimiento por no haberse nombrado un defensor judicial a los menores. No lo sostuvimos así analizando la naturaleza del procedimiento ejecutivo, pues siendo el objeto del defensor judicial el que represente al menor en la *comparecencia* que debe hacer, en un procedimiento

ejecutivo el demandado no tiene derecho a comparecer excepto en los tres casos a que se refiere el artículo 175 del Reglamento para la ejecución de la Ley Hipotecaria, y los motivos a que se refiere dicho artículo 175 no existían en aquel procedimiento ejecutivo que se llevó contra los menores. Por esas razones concluimos que ningún perjuicio se causó a los menores por no habérseles nombrado un defensor judicial en un caso en que según reza la opinión ellos no hubieran podido comparecer aún representados por el defensor.

En *Tyrell* v. *Saurí*, 71 D.P.R. 460, se trataba de una acción ordinaria sobre declaración de prodigalidad en que se celebró el juicio en rebeldía. Sostuvimos que la corte no carecía de jurisdicción por el hecho de que al celebrarse el juicio en rebeldía el demandado no estuviera representado por un defensor judicial. Interpretando las Reglas 17 (*f*) y *g* (3) de las de Enjuiciamiento Civil de 1943, sustancialmente iguales a los artículos 56 y 57 del Código, dijimos que las disposiciones de esas reglas presuponían que fuera parte en el litigio un menor, demente o persona incapacitada, y que en ese caso no se trataba de un demente o de una persona incapacitada, ya que precisamente el fin de la acción sobre prodigalidad era determinar si el demandado estaba o no capacitado para administrar sus bienes y tampoco implicaba, de no estarlo, una declaración de incapacidad total. Distinguimos el procedimiento de la acción para declarar incapaz a una persona bajo el artículo 182 del Código Civil que requiere el nombramiento de un defensor al presunto incapaz que no quiera o no pueda defenderse, y reafirmamos lo dicho en *Trueba*, que el nombramiento de un defensor judicial es materia procesal y no de jurisdicción. California y Nueva York, donde existen disposiciones similares al artículo 93 nuestro, han establecido igualmente que una persona loca que no lo ha sido declarada judicialmente y a quien ya no se le ha nombrado un tutor, se le emplaza de la misma manera que a una persona cuerda. Véase: Véase *Dunn* v. *Dunn*, 46 Pac. 5 (1896);

*Sacramento Bank* v. *Spencer*, 53 Cal. 737 (1879) ; *Olivera* v. *Grace*, 122 P. 2d 564, 568 (1942) ; *Briggs* v. *Briggs*, 325 P.2d 219, 222 (1958) 40 Cal. Jur. 2d sec. 27, págs. 54–55; *Jacobs* v. *Jacobs*, 217 N.Y.S. 280, 282 (1926) confirmado 217 N.Y.S. 918; *Dunn* v. *Dunn*, 216 S.W. 2d 141 (1949).

A tenor de las autoridades citadas hay que convenir en que la demandante Carmen Hernández podía ser demandada en divorcio no obstante su estado de locura; y aun cuando a su esposo le constaba su condición mental, y él era la persona autorizada en primer lugar a obtener la declaración judicial de su incapacidad y el nombramiento de un tutor para ella de acuerdo con lo dispuesto en el artículo 181 del Código Civil, —31 L.P.R.A. sec. 704,—la citación diligenciada en la persona demente de su esposa no dejó de investir a la corte, por tal hecho en si, de jurisdicción para conocer del pleito de divorcio. (⁷)

---

(⁷) Según apunta la *Monografía* en 19 A.L.R. 2d a las páginas 180–182, los casos más remotos establecieron la pauta de que la locura del cónyuge demandado impedía la interposición de una demanda de divorcio o suprimía una ya interpuesta, por la razón de que una persona loca no podía defenderse a sí misma, siguiendo la norma de los casos criminales, en que no puede juzgarse a un delincuente mentalmente incapacitado aunque cometiera el delito siendo capaz, porque una mente sana es un requisito previo de defensa. Esta doctrina no se sostiene ya en los casos modernos, en que puede entablarse una acción de divorcio contra el cónyuge demente por actos que constituyen causas para el divorcio cometidos por él antes de sobrevenirle la locura. La razón principal que ha tenido el posterior enfoque es que su defensa puede encomendarse por la corte a un *defensor ad litem* a quien se puede notificar los procedimientos; y en aquellos casos en que no existe una declaración de incapacidad y un tutor nombrado, puede igualmente demandársele ya que la corte, *al informarse* de su locura, ha de nombrarle un defensor. Por estas razones, las cortes han dicho que el cónyuge incapacitado mentalmente no está en una situación mayor de desventaja en un caso de divorcio que como lo estaría en otra clase de litigios. Sin embargo, las cortes han enfatizado que la acción debe suspenderse hasta que al cónyuge incapaz se le ha nombrado un defensor judicial.

En el caso de *Subirana*, como en un gran número de casos revisados, se alegaron actos constitutivos de una causal de divorcio ocurridos con anterioridad a sobrevenirle la locura al cónyuge demandado. Está claramente establecido, con la debida protección procesal del nombramiento de un defensor, que puede demandarse al cónyuge demente en tales casos, y de probarse los hechos así ocurridos mientras era cuerdo, dictarse un

 Con las conclusiones a que hemos hecho referencia la Sala sentenciadora dispuso del caso declarando sin lugar la demanda. No se manifestó sobre los otros planteamientos del pleito, ni los resolvió, encaminados a que se decretara la nulidad de la sentencia de divorcio, sobre los cuales versó mayormente el litigio. Ello nos lleva a considerar los motivos del segundo señalamiento de error: el no haberse declarado nula la sentencia de divorcio obtenida a base de alegados actos cometidos por la demandante estando incapacitada por los cuales ella no era responsable dado su estado mental; y por la ocultación que Fernando Zapater hizo a la Corte del estado de incapacidad mental en que se encontraba su esposa. La

---

decreto de divorcio. Véase: *Monografía* citada; *Nelson* v. *Nelson* (Or. 1960), 350 P.2d 702; *Quinn* v. *Quinn* (Tenn. 1935), 83 S.W.2d 269; *Cobb* v. *Cobb* (Wash. 1943), 143 P.2d 856; *Dunn* v. *Dunn* (Mo. 1948), 216 S.W.2d 141; *Harrigan* v. *Harrigan* (Cal. 1902), 67 Pac. 506; *Olivera* v. *Grace*, supra; y *Monografía* que le sigue en 140 A.L.R. 1386.

El caso ahora ante nos presenta el aspecto, que no tuvimos en el de *Subirana*, que durante el período en que se alegó en la demanda de divorcio la comisión de los actos de trato cruel e injurias graves el récord demuestra, sin lugar a dudas, que la esposa ya padecía de sus facultades mentales. Establecido que al cónyuge mentalmente enfermo se le puede demandar, la cuestión de la locura gira entonces en torno a los méritos del caso, en cuanto a si debe o no prosperar la acción a base de la responsabilidad legal del cónyuge demandado por los actos que se le imputan. En este sentido la doctrina establece que no procede el divorcio por causales cometidas por el cónyuge en estado de incapacidad mental (con excepción, por supuesto, del caso en que la locura misma es una causal), particularmente aquellas causales que requieren una intención específica o de una conducta esciente. Véase la discusión en la Monografía citada en 19 A.L.R. 2d págs. 144–180 que sigue al caso inglés de *White* v. *White* (1950) Prob. 39. *Rivera* v. *Cruz*, 67 D.P.R. 770. *Willis* v. *Willis* (Mo. 1954), 274 S.W.2d 621; *Nelson* v. *Nelson* (Ohio 1958), 154 N.E.2d 653; *Trethewey* v. *Trethewey* (Fla. 1959), 115 So.2d 712; *Carlson* v. *Carlson* (Ill. 1941), 32 N.E.2d 365; *McIntosh* v. *McIntosh* (Miss. 1928), 117 So. 352; *Heim* v. *Heim* (Ohio 1930), 172 N.E. 451; Nelson on *Divorce and Annulment*, 2d ed., Vol. 1, págs. 355–357.

No habremos de resolver en esta ocasión, ya que ante nos no está el caso de divorcio en sí, si dentro de su estado mental la aquí demandante era totalmente irresponsable de los actos que se le imputaron o si no obstante su estado, ella conocía y era capaz de darse cuenta de la naturaleza de la alegada conducta hacia su esposo, de modo que hubiera o no procedido un divorcio en los méritos de habérsele puesto en condición de defenderse. Cf: *White* v. *White*, supra.

Sala sentenciadora no obstante concluir que la demandante era una esquizofrénica, no hizo pronunciamiento alguno en derecho sobre este otro aspecto del caso. Tal como se manifiesta en el récord, el planteamiento penetra hondo en la conciencia de lo que debe ser un procedimiento judicial equitativo y justo que no convierta en irreal el pleno sentido del derecho de un demandado de ser oido y defenderse antes de recibir una sentencia en su contra.

En el caso de *Subirana* sostuvimos que procedía la acción de divorcio contra un cónyuge demente pero puntualizamos el hecho, que en la evaluación total de las circunstancias no deja de tener una mayor importancia en cuanto al aspecto que ahora consideramos, de que los actos causales de la acción habían ocurrido antes de sobrevenir la locura. En el de *Fuentes* v. *Federal Land Bank,* supra, aunque sostuvimos el requerimiento de pago hecho en la persona de aquella demente, creimos apropiado añadir a renglón seguido:

"En los Estados Unidos las cortes de equidad, si bien sostienen que el emplazamiento o citación hecho a un demente que no ha sido declarado incapaz no es nulo ni siquiera anulable, conceden un remedio al demente dejando sin efecto la sentencia cuando ha existido fraude o cuando el demandante ha obtenido una indebida ventaja sobre el demente o la sentencia resulte injusta o contraria a la equidad. Pero por lo regular las cortes de equidad no intervienen a menos que el demente demuestre que tiene una defensa en los méritos o que en caso de dejarse sin efecto la sentencia y darle una oportunidad de ser oido la sentencia dictada sería distinta. Monografías en 34 A.L.R. 221, 140 A.L.R. 1336."

Expuesto lo anterior, creimos también apropiado hacer esta salvedad:

"En el presente caso el banco no tomó ninguna ventaja indebida contra la demente. La deuda reclamada era legítima y la adjudicación de la finca al banco por la cantidad de seis mil dólares no causó a ella perjuicio alguno, toda vez que el propio juez sentenciador en este caso declaró que la finca al tiempo de ser adjudicada en el procedimiento ejecutivo tenía un valor de seis mil dólares. Además, el banco, luego de ges-

tionar la venta de la finca por algún tiempo, no pudo obtener un precio más alto que el que pagó José Manuel Medina el 25 de marzo de 1938, o sea cuatro mil cien dólares."

Y en el de *Díaz* v. *Quiñones*, supra, no obstante sostenerse la validez de un requerimiento de pago hecho a unos menores a quienes no se les había nombrado defensor judicial, advertimos que por tal motivo hubiéramos convenido con la corte inferior en anular el procedimiento, de haberse tratado de otro tipo de acción que no hubiera sido el ejecutivo hipotecario en donde los menores no tenían que hacer una comparecencia. Cf: *Planas* v. *Chambers*, 59 D.P.R. 494.

En el caso presente concurrieron una serie de hechos que tomados en conjunto dejan la fuerte convicción que no pudo haber un proceso judicial honrado y equitativo, ni pudo dictarse una sentencia justa contra aquella demanda por causa de indefensión, que no sólo quedó con el sello de esposa culpable a pesar de que su estado mental pudo haberle provisto una meritoria defensa y exonerarla de responsabilidad, sino que también ella y sus hijos quedaron perjudicados en sus derechos patrimoniales. La esquizofrenia de la demandada y el conocimiento pleno que su esposo tenía de ese estado de locura son hechos que palpitan en el récord. No se le emplazó también en la persona de un tutor, con la mayor protección que ello ofrecía para su defensa, porque el propio marido, en quien recaía primordialmente la obligación de gestionar la declaración judicial de su incapacidad, no lo hizo. La Corte no dio cumplimiento a lo que disponían los artículos 56 y 57 sobre el nombramiento de un defensor *ad litem* porque el esposo en momento alguno le informó el hecho del estado de locura de su mujer. Aunque procesalmente la citación podía ser diligenciada en la persona de la esposa, a su marido le constaba el hecho que en ausencia de un defensor mal podía ella hacer las determinaciones pertinentes para defenderse de la acción. Hay la conclusión médica en el récord, no destruida, que con los síntomas que presentaba la demandante

ella estaba fuera de la realidad y no podía darse cuenta de lo que era un emplazamiento y de lo que había recibido. Y queda el hecho, que la prueba demuestra preponderantemente, que para el período en que la demanda de divorcio imputó la comisión de los actos de trato cruel e injurias graves la demandante estaba ya padeciendo de su mente. No se menciona esto último por lo que pudo haber de exposición inexacta a la Corte en las alegaciones en sí de la demanda sobre su conducta, y de que no habían bienes gananciales, lo que se ha denominado en la doctrina como fraude *intrínseco*, lo cual, según apuntamos antes, no habremos de resolver en este recurso, sino para enfatizar hasta qué punto existía una defensa meritoria que pudo haber cambiado el resultado del fallo, y hasta qué punto existiendo tal defensa, la necesidad del nombramiento de un defensor judicial no nombrado debido al silencio del esposo, la ausencia del cual no hizo de aquel procedimiento uno justo y equitativo para ella. Nos resistiríamos a creer que de haberse informado a la Corte en el pleito de divorcio la locura de la esposa, la corte hubiera dejado de observar la ley y procediera a dictar sentencia sin nombrar un defensor judicial, particularmente en un procedimiento en que el Estado mismo se considera tener un gran interés. Nos resistiríamos también a creer que de haberse nombrado un defensor judicial, éste no hubiera levantado como defensa la irresponsabilidad de la demandante en cuanto a los actos que producían la causa de acción, defensa ésta que de acuerdo con el consenso de la jurisprudencia pudo haber llevado el pleito a un resultado distinto.([8])

Las autoridades no dejan lugar a dudas que una sentencia así dictada no debería prevalecer. En *Rice* v. *Rice* (Mass. 1955), 125 N.E.2d 787, confirmando la anulación de un decreto de divorcio por trato cruel y abusivo dictado contra una

---

([8]) La causal de divorcio por razón de locura no existía en 1922. Se adicionó al artículo 96 del Código Civil por la Ley Núm. 78 de 1938 y requiere la locura incurable por un período de más de 7 años que impida gravemente la convivencia espiritual de los cónyuges.

esposa demente al tiempo de radicarse la acción, sin que el marido informara el hecho al tribunal, expresó la Suprema Corte Judicial de Massachusetts con acopio de abundantes autoridades, que el juez había concluido que el marido sabía de la locura de su esposa o intencionalmente se había abstenido de enterarse para no informarlo al tribunal, y que dicho proceder constituía un fraude a la corte y justificaba que se anulara el decreto. El acto, que de ser realizado por una persona normal daría lugar a un divorcio, no justifica la disolución del matrimonio si se comete por una persona demente, y concluyó que por el consenso de las autoridades americanas un divorcio no puede concederse basado en trato cruel y abusivo por actos cometidos por una persona loca. La defensa de locura que pudo haber sido presentada por la esposa era una defensa meritoria y sustancial. Si la locura de la esposa hubiera sido conocida por el juez, bajo las leyes del Estado el divorcio no se hubiera concedido.

*Edison* v. *Edison* (Cal. 1960), 178 C.A.2d 632, anuló un decreto de divorcio bajo la alegación de la esposa que el marido cometió fraude al tribunal ocultándole el hecho de que ella estaba mentalmente incapacitada, habiéndola privado de esa manera de su derecho a ser oida y de un juicio adversativo imparcial. Expresó el tribunal que de haber informado el marido a la corte la condición mental de su esposa, que conocía, por lo menos se habría pospuesto una decisión del caso hasta que la cuestión de la capacidad mental se hubiera determinado. Al argumento del esposo en su justificación de que le había informado dicha condición mental a su abogado, el tribunal dijo que tal información bajo la relación confidencial de abogado y cliente no exoneraba al marido de su deber de informarle el hecho a la corte, ni evitaba o aminoraba el fraude al tribunal, a la esposa y a los hijos habidos de ellos.

En *Saunders* v. *Saunders* (Cal. 1958), 320 P.2d 131, una acción de la esposa para anular a base de fraude un decreto

de divorcio, se revocó a la corte inferior al negarse a permitir enmiendas a la demanda original alegando que al tiempo de los procedimientos de divorcio ella estaba mentalmente incapacitada y que a su marido le constaba ese hecho; que ella era incapaz de manejar sus asuntos y para cooperar con su abogado en la defensa de la acción de divorcio, su abogado no sabía que ella estaba mentalmente incapacitada; su marido ocultó tal hecho al tribunal y al abogado de ella y no se le nombró tutor ni un defensor judicial; que en esa situación se aprobó en el caso de divorcio un acuerdo de disposición de las propiedades, y que a no ser por su condición mental el decreto de divorcio no se hubiera concedido ni el de la disposición de los bienes aprobado, y que la actuación del marido impidió que ella fuera debidamente aconsejada por su abogado así como el presentar en corte su caso. Dijo la corte, apoyándose en abundantes autoridades, que aunque el esposo en el caso de divorcio no hizo nada para mantener a su esposa fuera del tribunal y no hizo ninguna exposición falsa a la corte, él estaba en una posición en que tenía positivamente el deber de hablar y de decir la verdad, y que las decisiones que envuelven relaciones de confianza como las de marido y mujer sostienen que el silencio no justificado de uno que debió hablar, constituye un fraude extrínseco o un error que debe deshacer un fallo obtenido en esa forma. Las cortes, se dijo, frecuentemente anulan fallos emitidos contra demandados incapaces cuando existe la probabilidad de que haya ocurrido una injusticia, y existe un reconocido poder equitativo para relevar a demandados dementes de sentencias dictadas en circunstancias injustas. La jurisdicción equitativa para intervenir con tales sentencias se basa, dice la corte, en la ausencia de un procedimiento adversativo e imparcial. El abogado de la esposa ignoraba su estado mental; el marido conocía ese hecho al igual que la incapacidad de su esposa, y dejó de informar ambas cosas al tribunal. Esto representaba suficiente equidad a favor de la esposa para echar a

un lado el decreto de divorcio, ya se llamara fraude extrínseco, error extrínseco o ya fuera el ejercicio del bien reconocido poder equitativo utilizado para relevar a demandados dementes de sentencias dictadas en circunstancias no justas.

En *Wilder* v. *Wilder* (Ark. 1944), 181 S.W.2d 17, se anuló un decreto de divorcio obtenido por el esposo por la causal de separación de tres años en que el marido ocultó al tribunal el hecho de que la esposa estaba loca al tiempo en que se obtuvo el decreto, no siendo la separación un acto voluntario de ella. Dijo el tribunal que se había concedido el divorcio sobre una causa de acción inexistente que no hubiera dado lugar a concederlo si el hecho que el marido conocía del estado mental de su esposa y su reclusión lo hubiera informado a la corte. Esto, se dijo, constituyó un fraude al tribunal en la obtención del divorcio.(⁹)

En *Heine* v. *Witt* (Wiss. 1947), 28 N.W.2d 248, el marido rompió el vínculo con la esposa demente presentándola a ella como demandante en la acción para lo cual le proveyó los servicios de su abogado. Él compareció por abogado pero no contestó. Se hizo una estipulación en cuanto a la división de la propiedad. La esposa solicitó que se dejara sin efecto la sentencia a base de que ella estaba mentalmente incapacitada, hecho que era del conocimiento del marido y del abogado que éste le puso. Concluyendo que la prueba demostraba preponderantemente el estado de locura de la esposa, dijo el tribunal que si el abogado que la representó hubiera informado el hecho al abogado de divorcios (oficina creada para proteger el interés público en tales casos) o al juez, no habría duda que el juez hubiera insistido en el testimonio del siquiatra y el divorcio pudo haberse negado. No aparecía de la evidencia si el abogado de ella informó al del marido el estado de locura. Conociéndolo, y no habiéndoselo revelado al juez ni al abogado de divorcios, era su deber decírselo al abogado del esposo para que el caso no fuera en rebeldía y la

---

(⁹) Cf: *Rivera* v. *Cruz*, 67 D.P.R. 770.

alegación de locura se hubiera litigado. En ninguna otra manera podía él haber evitado ayudar en la perpetración de un fraude a la corte. Si al abogado del marido no se le informó, el de ella participó en un fraude a la corte, y si aquél fue informado, participó en dicho fraude al no levantar la cuestión de la locura. A la contención del juez sentenciador de que la locura de la esposa no privaba a la corte de jurisdicción, dijo el tribunal que ese no era el problema, y que si ella estaba demente y se cometió un fraude no informando a la corte de ese hecho, el fallo debió anularse. Aun cuando la esposa tuviera intervalos de lucidez, se dijo, el marido no podía tomar ventaja sobre ella por el hecho de que estuviera en uno de esos períodos al decretarse el divorcio.

En *Taylor* v. *Taylor* (Va. 1932), 165 S.E. 414, se sostuvo igualmente, haciendo una revisión de las autoridades, que un divorcio obtenido en condiciones en que el marido ocultó a la corte el estado de locura de la esposa podía dejarse sin efecto a pesar del subsiguiente matrimonio del marido y de haber transcurrido un lapso de varios años. El divorcio se había obtenido en 1914, el marido falleció en 1927 y la acción se interpuso en 1931. Se dijo al anularse el divorcio que el esposo había ocultado a la corte que la demandada estaba loca y le había ocultado el hecho que la ausencia de ella del Estado fue por acuerdo de él. Si esos hechos se hubieran demostrado la corte no hubiera considerado el caso. El marido obtuvo un divorcio en condiciones en que él no tenía derecho a obtenerlo, y no por error de la corte al decidir la contienda sino debido a hechos extraños a la controversia del caso que el marido conocía y que en tiempo debió hacérselo saber al tribunal. La demandada no lo pudo hacer saber porque estaba loca, y la omisión de ella de actuar por tanto tiempo no podía tomarse en su contra porque su condición mental impedía que ella fuera consciente de sus derechos.

En *Jorgensen* v. *Jorgensen* (Cal. 1948), 193 P.2d 728, una acción de la esposa para eliminar de un decreto de divorcio

ciertas disposiciones relativas a un acuerdo sobre disposición de la propiedad por el fundamento de que el marido ocultó hechos, discutiendo el problema dijo la Corte Suprema de California en pleno que aunque no procedía conceder un remedio equitativo para litigar de nuevo una controversia basado en alegaciones o prueba fraudulenta de alguna de las partes, o en error, podía obtenerse tal remedio si la parte que lo pide fue impedida, debido a fraude o a error de la otra, de participar en el procedimiento o de presentar adecuadamente su caso. Se dijo que la norma que permite a un litigante obtener un remedio contra una sentencia en un procedimiento en que no tuvo una justa oportunidad de litigar su caso se aplica cuando la parte contraria, en violación de un deber que surge de una relación fiduciaria o de confidencia, le oculta hechos que le son esenciales a la protección de sus derechos. La omisión de cumplir con el deber de hablar o de hacer revelaciones que una persona tiene por su condición fiduciaria o confidencial, dijo la Corte Suprema de California citando a *Freeman*, es obviamente un fraude que permite en equidad el relevar de una sentencia obtenida en esa forma, aunque el incumplimiento de tal deber ocurra en el curso de un procedimiento judicial y envuelva testimonio falso, y ello es así ya se considere el fraude como extrínseco o como una excepción a la regla del fraude extrínseco.

*Preston* v. *Reed* (Me. 1945), 44 A.2d 685, un caso en que se trató de revocar o corregir una sentencia de divorcio contra la esposa por el fundamento de que ella estaba loca, no tenía tutor ni se le nombró un defensor, no estuvo representada en el juicio y que la sentencia se había obtenido a base de fraude al tribunal, se dijo que el reparar un daño a la persona y el condenar el fraude a la propia corte eran atributos de la justicia y sería una parodia sostener que no hay un remedio. Si un demandante obtiene sentencia contra un demente sin la sugerencia a la corte del estado de locura, o sin notificación a un tutor, lo hace a su propio riesgo. Véanse:

*Ammon* v. *Wiebold* (N. J. 1901), 48 Atl. 950; *Gillespie et al.* v. *Gouly* (Cal. 1898), 52 Pac. 816; *Cahaley* v. *Cahaley* (Minn. 1943), 12 N.W.2d 182; *Olivera* v. *Grace* (Cal. 1942), 122 P.2d 564.

En *Olivera* v. *Grace*, supra, el Tribunal Supremo de California en pleno ofrece una amplia discusión del problema ante nos. Se trataba de una acción para anular una sentencia obtenida contra una demandada demente que modificó los términos de un contrato de comunidad de bienes. Las cortes, se dijo, con frecuencia echan a un lado fallos rendidos contra personas mentalmente incapacitadas cuando es probable que haya habido injusticia. Aparte de las situaciones en que las cortes ejercen el poder de dejar sin efecto sus sentencias bajo disposiciones estatutarias o bajo el poder inherente de corregir sus propios récords, existe una bien conocida jurisdicción equitativa que se ha utilizado para relevar a demandados dementes de las sentencias dictadas contra ellos en circunstancias no justas. La facultad equitativa de intervenir con dichas sentencias se basa en la ausencia de un honrado juicio contencioso en la acción. La base de esa jurisdicción es que no ha habido un juicio adversativo en ley. Una situación típica, se dice, ocurre cuando la falta de un juicio justo y adversativo es atribuible a hechos extraños a las cuestiones en controversia que impidieron a una de las partes presentar su caso a la corte, como cuando existe fraude extrínseco. Alguien a quien se le ha impedido por factores extrínsecos de presentar su contención a la corte puede traer una acción independiente en equidad para obtener un remedio contra el fallo así obtenido.([10]) Véanse: Freeman, *A Treat-*

---

([10]) Para la fecha en que se radicó esta acción regía la Regla 60 de las de Enjuiciamiento Civil de 1943. En *Roca* v. *Thomson*, 77 D.P.R. 419, un caso de divorcio, sostuvimos a base de la interpretación de California dada a su artículo 473, equivalente al 140 de nuestro Código de Enjuiciamiento Civil, que bajo la Regla 60 nuestra el fraude extrínseco podía servir de base para una moción para que se dejara sin efecto una sentencia, a pesar de que la Regla no lo mencionaba, en ese caso fue dentro del mismo pleito. La Regla 60 disponía en su apartado (b) que mediante moción,

*ise of the Law of Judgments*, 5ta. ed., Vol. III, secs. 1186, 1188, 1189, 1207, 1231–1237; Nelson, *Divorce and Annulment*, Vol. 1, pág. 355; Vol. 3, págs. 171 et seq; *Jelm* v. *Jelm* (Ohio 1951), 98 N.E.2d 401.

Bajo toda autoridad competente no puede llegarse a otra conclusión en derecho sino que la sentencia de divorcio dictada en rebeldía a que se refiere la presente acción estuvo viciada de fraude extrínseco al tribunal y a la parte en la obtención de la misma. En equidad y justicia, y a la luz de las buenas normas que deben regir el impartir justicia, una sentencia así obtenida debe dejarse sin efecto, a menos que consideraciones de peso, también de justicia y equidad, no lo haga aconsejable. Bajo igual autoridad, los hechos a que nos hemos referido no hacen la sentencia de divorcio nula de raíz o *ab initio*, pero sí anulable.

Esta fue en su comienzo una acción personal de la demandante Carmen Hernández iniciada en vida del demandado Fernando Zapater cuyo efecto básico hubiera sido el restablecer su estado matrimonial con el demandado mediante la anulación de la sentencia de divorcio. Interrumpidos los procedimientos, Fernando Zapater falleció en 1951. Disuelto en todo caso por la muerte el vínculo matrimonial que se alegaba aún subsistía entre ellos, el pleito perdía su razón principal de ser. Sólo quedaba a dilucidar los intereses materiales envueltos del patrimonio.

En esta etapa final del caso surgen inevitablemente consideraciones, invocadas vehementemente por los demandados-recurridos como es natural que lo hagan, que los tribunales en situaciones como éstas no han podido soslayar ni pasar por alto. Es el matrimonio posterior de Fernando Zapater, el hogar que junto a él constituyó su segunda esposa durante

la corte, etc. podía relevar a una parte...de una sentencia...y que la moción debería hacerse dentro de un término razonable en ningún caso después de transcurridos seis meses. Pero la propia Regla disponía que ella no limitaba el poder de una corte para tomar en consideración una acción para relevar a una parte de una sentencia, orden o procedimiento. Véase el artículo 7, párrafo 2do. del Código Civil.

28 años hasta que él falleció, y los hijos procreados en el seno de ese hogar. Son situaciones con que se confrontan los jueces en que en ambos lados de la contienda hay partes libres de culpa; y ya se conceda el remedio anulando o dejando sin efecto el divorcio, o ya se deniegue, alguna parte inocente ha de ser afectada. La decisión descansa más que nada en la sana discreción y juicio de los tribunales, que debe ser aquel justiciero que balanceando la equidad y la justicia que haya a favor de cada una de esas partes inocentes, ofrezca la solución más justa para todas y que menos daño cause a culquiera de ellas en particular.

Está firmemente sentado en la doctrina anglo-americana que un subsiguiente matrimonio, aun cuando haya hijos, no impide por tal solo hecho que una corte deje sin efecto o anule una sentencia anterior de divorcio si ello procediera. Pero también es doctrina igualmente firme, que la existencia de un segundo matrimonio, particularmente si ha procreado hijos, debe inducir a las cortes a proceder con extremada cautela y precaución para anular un divorcio, aun en los casos de fraude al tribunal, a menos que el segundo cónyuge fuera también culpable de los hechos o hubiere ayudado a perpetrarlos. Igualmente es doctrina aceptada que la muerte de cualquiera de los cónyuges extingue la acción para anular el divorcio, a no ser que hayan intereses propietarios envueltos. [11] El mismo interés público que no sanciona que un matrimonio se disuelva por medios impropios, vela también, por las mismas razones de interés social, porque las partes inocentes de un segundo matrimonio no queden desamparadas, sobre todo si se ha formado una familia y ese matrimonio ha perdurado ante la sociedad por más de un cuarto de siglo.

Nada indica en el récord que la esposa del segundo ma-

---

[11] Una extensa recopilación y reseña de casos antiguos y modernos sobre los principios apuntados aparece en L.R.A. 1917 B, págs. 486–492; 157 A.L.R., págs. 46–59; 12 A.L.R. 2d, págs. 153–173; 22 A.L.R. 2d, págs. 1321–1327.

trimonio de Fernando Zapater no fuera completamente inocente de los hechos ocurridos. Por otra parte, ningún tribunal podría ya restituir un matrimonio que va para diez años quedó de todos modos disuelto para siempre. La prueba en el récord demuestra, aunque la Sala sentenciadora no pasó sobre ello, que a la fecha en que la demandante otorgó a su esposo el poder con el cual él dispuso de los bienes gananciales, ya ella padecía de sus facultades mentales.

A la luz de todas las circunstancias a ser consideradas, y de la equidad que se le debe a todos los miembros de esta familia que son las partes adversas, no quedarían mejor servidos los fines de la justicia y de la sociedad anulando ahora la sentencia de divorcio dictada en 1922 en cuanto la misma disolvió el vínculo matrimonial anterior, alterándose como resultado todo el estado filial de una familia. La sentencia de divorcio debe quedar sin efecto en cuanto al pronunciamiento sobre no existencia de bienes gananciales.

*Se revoca la sentencia dictada en este caso que declaró sin lugar la demanda en cuanto a la primera causa de acción, y se dictará otra con los siguientes pronunciamientos: 1) dejando sin efecto la sentencia de divorcio en cuanto al pronunciamiento sobre la no existencia de bienes gananciales; 2) devolviéndose el caso a la Sala sentenciadora: (a) para que a tenor de la prueba en el récord y de aquella otra que se aportare según estipularon las partes, resuelva si fue válida la disposición de los bienes gananciales que hizo Fernando Zapater antes del divorcio, entre ellos la finca de 3 cuerdas 47 céntimos que luego readquirió como divorciado, y de anularse dichos traspasos, proceda entonces a liquidar dichos bienes gananciales como corresponda en ley; (b) para cualesquiera otros procedimientos ulteriores no incompatibles con esta opinión.*

El Juez Asociado Sr. Hernández Matos no intervino.